IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

SAUL V. GUILLIOT                        §
(BOP Register No. 14208-035),           §
                                        §
           Plaintiff,                   §
                                        §
V.                                      §        No. 3:17-cv-2701-M-BN
                                        §
D.J. HARMON, Warden, ET AL.,            §
                                        §
           Defendants.                  §

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION OF THE
UNITED STATES MAGISTRATE JUDGE**

This *pro se* action brought by Plaintiff Saul V. Guilliot, a federal inmate, alleging

violations under the United States Constitution and the Religious Freedom Restoration

Act of 1993 ("RFRA"), 42 U.S.C. § 2000bb *et seq.*, has been referred to the undersigned

United States magistrate judge for case management under 28 U.S.C. § 636(b) and a

standing order of reference from Chief Judge Barbara M. G. Lynn.

Defendants D.J. Harmon, Dr. Jennifer Caperton, G. Schanfish, and Dr. Kevin

McDermott – all current or former Bureau of Prisons ("BOP") employees – move to

dismiss Guilliot's complaint under Federal Rule of Civil Procedure 12(b)(6). *See* Dkt.

Nos. 14 & 15. Guilliot filed a response. *See* Dkt. No. 18. And Defendants filed a reply.

*See* Dkt. No. 19.

The undersigned enters these findings of fact, conclusions of law, and

recommendation that, for the reasons and to the extent explained below, the Court

should grant the motion in part and deny it in part.

## Applicable Background

Guilliot is incarcerated at FCI Seagoville, serving a 151-month sentence for receiving child pornography, in violation of 18 U.S.C. § 2252A(a)(2)(A). *See United States v. Guilliot*, No. 6:08-cr-334 (01) (W.D. La), *aff'd*, 383 F. App'x 416 (5th Cir.) (per curiam), *cert. denied*, 562 U.S. 1017 (2010).

On January 30, 2017, Guilliot, who identifies as a Wiccan, sent an electronic request to Defendant Schanfish, a supervisory chaplain at Seagoville, requesting justification for his being denied access to a Rider-Waite Tarot deck – a tarot deck containing depictions of nudity. *See* Dkt. No. 3 at 3 ¶ 8; *see also id.* at 3 ¶ 9 (explaining that "[t]he Rider-Waite Tarot deck dates back to pre-Renaissance Europe. While some of cards contain artistic depictions of non-sexualized nudity, the deck as a whole is generally considered religious artwork of a historical nature.").

On February 1, 2017, Defendant "Schanfish contacted Dr. Paulson in Psychology Services to inform him that [Guilliot] was engaging in 'risk-relevant behavior,' which is conduct prohibited for inmates convicted of a sex offense. Dr. Paulson asked Schanfish to confirm that [Guilliot] was classified as a sex offender, and then referred Schanfish to McDermott, then acting [Sex Offender Management Program ("SOMP")] Coordinator." Dkt. No. 3 at 4 ¶ 15.

On February 2, 2017, an officer searched Guilliot's locker and living quarters and confiscated several items. *See id.* at 4 ¶¶ 16-17. Guilliot alleges that these items were confiscated because they were "falsely categorized by [Defendant] McDermott as containing nudity, explicit sexual acts, and adolescents." Dkt. No. 3 at 5 ¶ 19. One

month later, Defendant McDermott issued a Correctional Management Plan ("CMP") for Guilliot's possession of the confiscated materials. *See id.*; *see also id.* at 5 ¶ 20 (asserting that "[t]he CMP contains various restrictions on [his] access to materials"; that "being on a CMP (which has no defined expiration date) is similar to deferred restrictions imposed for violations of other Prohibited Acts, which is further similar to a suspended imposition of sentence coupled with probation"; and that "CMP significantly increases an inmate's likelihood of civil commitment, increases the inmate's assessed risk level, and is the only psychological data transmitted to the United States Probation Office without an inmate's consent prior to release").

Based on these events, Guilliot alleges violations of RFRA [Claim 1], the First Amendment [Claims 3 and 4], and due process [Claim 5], and he further alleges that Defendants Schanfish and McDermott, in their individual capacities, retaliated against him in violation of the First Amendment [Claim 2]. *See id.* at 1-9.

## Legal Standards and Analysis

### I.    <u>Sovereign Immunity</u>

Although Defendants move to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6), asserting that Guilliot has failed to state a claim upon which relief may be granted, the manner in which Guilliot has pleaded several of his claims requires the Court to first question whether it has jurisdiction to consider those claims. Guilliot asserts Claims 1, 3, and 4 against Defendants only in their official capacities. *See* Dkt. No. 3 at 2. And, while Claim 5 is asserted against Defendants Harmon and Caperton only in their official capacities, it is asserted against Defendant McDermott

in both capacities. *See id.*

A federal prisoner may bring an action under *Bivens v. Six Unknown Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971), against BOP employees in their individual capacities, "but he may not bring an action against the United States, the BOP, or BOP officers in their official capacities as such claims are barred by the doctrine of sovereign immunity." *Gibson v. Fed. Bureau of Prisons*, 121 F. App'x 549, 551 (5th Cir. 2004) (per curiam) (citing *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 71-72 (2001); Hafer v. Melo, 502 U.S. 21, 25 (1991)). And because "[s]overeign immunity is jurisdictional," *F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994), it "'cannot be waived by government attorneys'" – instead, "the court must 'raise the ... issue *sua sponte*,' even if the government's attorney fails to do so," *United States v. Rodriguez*, No. EP-CR-1865-PRM, 2011 WL 5854369, at *13 (W.D. Tex. Feb. 18, 2011) (quoting *Clymore v. United States*, 415 F.3d 1113, 1118 n.6 (10th Cir. 2005)).

First, because Guilliot requests injunctive relief, in addition to monetary compensation, *see* Dkt. No. 3 at 12-13, the Court at least has jurisdiction over that aspect of his RFRA claim, *see, e.g., Oklevueha Native Am. Church of Hawaii, Inc. v. Holder*, 676 F.3d 829, 840-41 (9th Cir. 2012) (applying *Sossamon v. Texas*, 563 U.S. 277 (2011), which held that states did "not consent to waive their immunity to suits for monetary damages under RLUIPA," to RFRA's analogous appropriate-relief provision, 42 U.S.C. § 2000bb-1(c)). But the Court lacks jurisdiction over Claims 3 and 4 entirely and over Claim 5 to the extent that claim is asserted against Defendants Harmon and Caperton. Accordingly, Claim 3, Claim 4, and Claim 5 except as to Defendant

McDermott should therefore be dismissed without prejudice for want of jurisdiction.

While this jurisdictional issue is being raised here in the first instance, the period for filings objections to the findings, conclusions, and recommendation provides Guilliot an opportunity to respond. And, because he should be allowed leave to file an amended complaint, he will have an opportunity to amend these claims to the extent that he can show that the Court has jurisdiction over them.

II.    <u>Failure to State a Claim</u>

    **A.**    **Legal Standards**

In deciding a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief may be granted, the Court "accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205-06 (5th Cir. 2007). But a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and must plead those facts with enough specificity "to raise a right to relief above the speculative level," *id.* at 555.

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* "A claim for relief is implausible on its face when 'the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct.'" *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d

787, 796 (5th Cir. 2011) (quoting *Iqbal*, 556 U.S. at 679).

While, under Federal Rule of Civil Procedure 8(a)(2), a complaint need not contain detailed factual allegations, a plaintiff must allege more than labels and conclusions, and, while a court must accept all of a plaintiff's allegations as true, it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). A threadbare or formulaic recitation of the elements of a cause of action, supported by mere conclusory statements, will not suffice. *See id*. But, "to survive a motion to dismiss" under *Twombly* and *Iqbal*, a plaintiff need only "plead facts sufficient to show" that the claims asserted have "substantive plausibility" by stating "simply, concisely, and directly events" that Plaintiff contends entitle him or her to relief. *Johnson v. City of Shelby, Miss.*, 574 U.S. ____, 135 S. Ct. 346, 347 (2014) (per curiam) (citing FED. R. CIV. P. 8(a)(2)-(3), (d)(1), (e)).

The United States Supreme Court "has made clear that a Rule 12(b)(6) motion turns on the sufficiency of the '*factual* allegations' in the complaint," *Smith v. Bank of Am., N.A.*, 615 F. App'x 830, 833 (5th Cir. 2015) (per curiam) (quoting *Johnson*, 135 S. Ct. at 347; emphasis added by *Smith*), and the Federal Rules of Civil Procedure "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted," *Johnson*, 135 S. Ct. at 346. That rationale has even more force in this case, as the Court "must construe the pleadings of *pro se* litigants liberally." *Andrade*, 459 F.3d at 543; *but see Smith v. CVS Caremark Corp.*, No. 3:12-cv-2465-B, 2013 WL 2291886, at *8 (N.D. Tex. May 23, 2013) ("[L]iberal construction

does not require that the Court or a defendant create causes of action where there are none.").

A court cannot look beyond the pleadings in deciding a Rule 12(b)(6) motion. *Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999). Pleadings in the Rule 12(b)(6) context include attachments to the complaint. *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007). Documents "attache[d] to a motion to dismiss are considered to be part of the pleadings, if they are referred to in the plaintiff's complaint and are central to her claim." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000) (quoting *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993)).

"Although the [United States Court of Appeals for the] Fifth Circuit has not articulated a test for determining when a document is central to a plaintiff's claims, the case law suggests that documents are central when they are necessary to establish an element of one of the plaintiff's claims. Thus, when a plaintiff's claim is based on the terms of a contract, the documents constituting the contract are central to the plaintiff's claim." *Kaye v. Lone Star Fund V (U.S.), L.P.*, 453 B.R. 645, 662 (N.D. Tex. 2011). "However, if a document referenced in the plaintiff's complaint is merely evidence of an element of the plaintiff's claim, then the court may not incorporate it into the complaint." *Id.*

In addition, "it is clearly proper in deciding a 12(b)(6) motion to take judicial notice of matters of public record." *Norris v. Hearst Trust*, 500 F.3d 454, 461 n.9 (5th Cir. 2007); *accord Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322

(2008).

### B.    RFRA [Claim 1]

Congress enacted RFRA in response to "*Employment Div., Dept. of Human Resources of Ore. v. Smith*, 494 U.S. 872 (1990), which held that neutral, generally applicable laws that incidentally burden the exercise of religion usually do not violate the Free Exercise Clause of the First Amendment," and, as a result, *Smith* "largely repudiated the method of analysis used in prior free exercise cases like *Wisconsin v. Yoder*, 406 U.S. 205 (1972), and *Sherbert v. Verner*, 374 U.S. 398 (1963)," which both "employed a balancing test that considered whether a challenged government action that substantially burdened the exercise of religion was necessary to further a compelling state interest." *Holt v. Hobbs*, 135 S. Ct. 853, 859 (2015) (citations omitted).

And RFRA and its later-enacted sister statute, the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc *et seq.* – which applies to state- and local-government action, *see Holt*, 135 S. Ct. at 859 – were passed "in order to provide very broad protection for religious liberty," *id.* (quoting *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2760 (2014)); *see also Moore v. Cross*, No. 05-2875 (JMR/RLE), 2007 WL 835417, at *11 (D. Minn. Mar. 15, 2007) ("As enacted, 'RLUIPA deals exclusively with state, rather than federal, prisons.'" (quoting *Lovelace v. Lee*, 472 F.3d 174, 217 (4th Cir. 2006); collecting cases)).

> Under RFRA, the Federal Government may not, as a statutory matter, substantially burden a person's exercise of religion, "even if the burden results from a rule of general applicability." § 2000bb-1(a). The only exception recognized by the statute requires the Government to satisfy the compelling interest test – to "demonstrat[e] that application of the

burden to the person – (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." § 2000bb-1(b).

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 424 (2006).

And RLUIPA "allows prisoners 'to seek religious accommodations pursuant to the same standard as set forth in RFRA.'" *Holt*, 135 S. Ct. at 860 (quoting *Gonzales*, 546 U.S. at 426); *see also Lindh v. Warden, Fed. Corr. Inst., Terre Haute, Ind.*, No. 2:14-cv-00142-JMS-DKL, 2016 WL 4528478, *6 (S.D. Ind. Aug. 30, 2016) ("RFRA and RLUIPA 'are substantively identical with respect to prisoners' entitlements,'" as "[b]oth statutes define 'exercise of religion' to include 'any exercise of religion, whether or not compelled by, or central to, a system of religious belief'" (quoting first *Whitfield v. Ill. Dep't of Corrs.*, 237 F. App'x 93, 94 (7th Cir. 2007) (per curiam), then *Hobby Lobby*, 134 S. Ct. at 2751.

The Fifth Circuit, in the context of RLUIPA, has explained that

[r]eligious accommodations must not override other significant interests in maintaining order and safety, and courts should give deference to prison officials "in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." *Cutter v. Wilkinson*, 544 U.S. 709, 723 (2005). Costs, limited resources, and prison security are all compelling state interests. *Id.* However, deference is not unlimited and "'policies grounded on mere speculation, exaggerated fears, or post-hoc rationalizations will not suffice to meet the act's requirements.'" *Rich v. Sec'y, Fla. Dep't of Corr.*, 716 F.3d 525, 533 (11th Cir. 2013) (quoting S. REP. NO. 103-111, at 10, *reprinted in* 1993 U.S.C.C.A.N. 1892, 1900) (discussing the Religious Freedom Restoration Act, predecessor to RLUIPA); *see also Holt*, 135 S. Ct. at 867 ("Indeed, prison policies 'grounded on mere speculation' are exactly the ones that motivated Congress to enact RLUIPA.").

The least-restrictive-means standard is "exceptionally demanding, and

requires the government to show that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting party." *Holt*, 135 S. Ct. at 864 (quotation omitted and alteration adopted). The Government must also demonstrate that the "compelling interest test" is satisfied when applying the challenged law to the "particular claimant whose sincere exercise of religion is being substantially burdened." *Id.* at 863 (quotation omitted). Thus RLUIPA requires a court to scrutinize "'the asserted harm of granting specific exemptions to particular religious claimants'" and look "'to the marginal interest in enforcing' the challenged government action in that particular context." *Id.* (quoting *Hobby Lobby*, 134 S. Ct. at 2779).

*Davis v. Davis*, 826 F.3d 258, 264-65 (5th Cir. 2016) (citations modified).

But, before examining the significant interests of the prison and whether those interests should yield to the religious accommodations of a particular prisoner-RFRA claimant, the Court must determine whether that claimant has stated a prima facie case. To do so, Guilliot, "must allege that the government (1) substantially burdened (2) a sincere (3) religious exercise." *Mack v. Warden Loretto FCI*, 839 F.3d 286, 304 (3d Cir. 2016) (citing *Gonzales*, 546 U.S. at 428).

"The theological legitimacy of a particular religious practice, a matter of faith and not of legal proofs, is not in question under RFRA." *United States v. Girod*, 159 F. Supp. 3d 773, 777 (E.D. Ky. 2015) (citing *Hobby Lobby*, 134 S. Ct. at 2778 (observing that the question "whether the religious belief asserted in a RFRA case is reasonable" is one "that the federal courts have no business addressing")). "Rather, the Court simply assesses an objector's sincerity of belief." *Id.* at 777-78 (citation omitted); *see, e.g., Tanksley v. Litscher*, No. 15-cv-126-jdp, 2017 WL 3503377, at *4 (W.D. Wis. Aug. 15, 2017) ("This means, at the threshold, that Tanksley's interest in the Initiatory Tarot must be rooted in a sincere religious belief, rather than a purely secular interest,

-10-

and that it is not merely a pose adopted to acquire material that would otherwise be banned."), *aff'd*, 723 F. App'x 370 (7th Cir. 2018) (per curiam).

Indeed, "[t]he sincerity of a plaintiff's belief in a particular religious practice is an essential part of the plaintiff's prima facie case under ... RFRA." *Tagore v. United States*, 735 F.3d 324, 328 (5th Cir. 2013) (citing *Gonzales*, 546 U.S. at 428). And, while "[t]he specific religious practice must be examined rather than the general scope of applicable religious tenets, and the plaintiff's 'sincerity' in espousing that practice is largely a matter of individual credibility," *id.* (quoting *Moussazadeh v. Tex. Dep't of Criminal Justice*, 703 F.3d 781, 791 (5th Cir. 2012) – like here, *see* Dkt. Nos. 15 & 19 – "the sincerity of a plaintiff's engagement in a particular religious practice is rarely challenged," *id.* (citing *Moussazadeh*, 703 F.3d at 791); *see also Moussazadeh*, 703 F.3d at 792 ("Though the sincerity inquiry is important, it must be handled with a light touch, or 'judicial shyness.' ... To examine religious convictions any more deeply [than a credibility assessment, at the appropriate procedural stage,] would stray into the realm of religious inquiry, an area into which we are forbidden to tread." (citations omitted)).

So, at least at the pleadings stage, the plausibility of a RFRA claim typically boils down to whether the claimant has alleged a substantial burden. *Cf. Girod*, 159 F. Supp. 3d at 778 ("An exercise of religion, if honestly professed by an adherent, receives protection against a substantial governmental burden not adequately justified.").

While "substantial burden" is not defined in the statute, the Supreme Court has

explained that a prisoner is substantially burdened if a prison's "policy requires" him "to 'engage in conduct that seriously violates [his] religious beliefs.'" *Holt*, 135 S. Ct. at 862 (quoting *Hobby Lobby*, 134 S. Ct. at 2775). For example, where "the religious practice is the growing of a beard, which petitioner believes is a dictate of his religious faith" – the sincerity of which is not disputed – and the prison's "grooming policy requires the petitioner to shave his beard ... or face serious disciplinary action," "[b]ecause the grooming policy puts petitioner to this choice, it substantially burden his religious exercise." *Id.*; *see id.* at 862-63 ("RLUIPA's 'substantial burden' inquiry asks whether the government has substantially burdened religious exercise ... , not whether the RLUIPA claimant is able to engage in other forms of religious exercise.... [It] applies to an exercise of religion regardless of whether it is 'compelled.' ... [And] the protection of RLUIPA, no less than the guarantee of the Free Exercise Clause, is 'not limited to beliefs which are shared by all of the members of a religious sect.'" (citations omitted)).

This examination of RLUIPA's statutory definition of "religious exercise," *see id.* at 862-63 (examining 42 U.S.C. § 2000cc-5(7)(A)), is just as applicable here, as "RFRA defines religious exercise by cross-reference to [RLUIPA]," *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1129 n.6 (10th Cir. 2013) (en banc) (citing 42 U.S.C. § 2000bb-2(4) ("the term 'exercise of religion' means religious exercise, as defined in section 2000cc–5 of this title")). And, as the district court in *Tanksley* explained,

> under RLUIPA, the question is whether the specific proposed religious exercise is substantially burdened, not whether the religious exercise is one that could be prohibited without making it too difficult to practice

> that religion. *Holt* reasoned from this definition to conclude that it does not matter whether the inmate has other means of practicing his religion, whether the inmate's religion actually compels the proposed practice, or whether the proposed practice is in the main stream of the religion. 135 S. Ct. at 862-63. Under *Holt*, RLUIPA protects every religious preference, no matter how idiosyncratic or how minor to the inmate's professed religion.

*Tanksley*, 2017 WL 3503377, at *5.

That court, considering the plaintiff's initial burden in the context of summary judgment, ultimately concluded that "any prohibition of requested religious property will constitute a substantial burden on a religious exercise, thus placing the burden on the prison to justify that prohibition." *Id.* at *6; *see also id.* ("If a prison official cannot at all consider the doctrine of the inmate's religion, even as the inmate describes it, then the only question is the nature of the prison's restriction of the inmate's religious exercise. Any outright prohibition of a requested religious practice would be a substantial burden. Restrictions on the time, place, and manner of the exercise may or may not impose a substantial burden.... '[C]ourts must accept a religious adherent's assertion that his religious beliefs require him to take or abstain from taking a specified action.' Instead, the question is 'what the challenged law actually requires of the plaintiff.' The government imposes a substantial burden on a religious exercise when it (1) compels the plaintiff to forego his religious exercise; (2) prohibits the plaintiff from performing his religious exercise; or (3) presents the plaintiff with a choice of incurring a serious penalty or engaging in conduct that seriously violates his religious beliefs." (quoting *Eternal Word Television Network, Inc. v. Sec'y of U.S. Dep't of Health & Human Servs.*, 818 F.3d 1122, 1144 (11th Cir. 2016); quotation marks and

-13-

brackets omitted)).

Thus, where a plaintiff has alleged facts from which it plausibly may be inferred that a prison rule prevented his access to property requested to engage in a particular religious practice, and where the sincerity of that request is not challenged, but, instead, the sincerity may be inferred from the facts alleged, *see* Dkt. No. 3 at 3 ¶¶ 8-10, that plaintiff has alleged a plausible claim under RFRA. And the government's argument that, "even if the Court finds [Guilliot] properly alleged a substantial burden on his religious exercise, the government may defeat a RFRA claim by showing that 'application of the burden ... is in furtherance of a compelling governmental interest; and is the least restrictive means of furthering that compelling governmental interest,'" Dkt. No. 19 at 8 (quoting 42 U.S.C. § 2000bb-1(b)), is one that should be made at summary judgment.

For these reasons, the motion to dismiss Guilliot's RFRA claim should be denied.

## C.     First Amendment Retaliation [Claim 2]

Guilliot alleges under *Bivens* that Defendants Schanfish and McDermott retaliated against him "in an attempt to discourage him from filing administrative remedies, which are an extension of his access to the courts under the First Amendment." Dkt. No. 3 at 10. He specifically alleges that two days after he requested the Rider-Waite Tarot deck, which he characterizes as "the first step in the process of exhausting administrative remedies prior to filing a complaint with a court," Defendant Schanfish contacted Dr. Paulson to report that Guilliot "was engaging in 'risk-relevant behavior.'" *Id.* at 4. Dr. Paulson then referred Schanfish to Defendant

McDermott, who requested the search of Guilliot's living quarters, which led to the

confiscation of some materials. *See id.* Guilliot further alleges that, one week after he

"filed the next step of his administrative remedy regarding access to religious

materials," McDermott placed him on a CMP. *Id.* at 4-5.

> The necessary elements of a valid retaliation claim require the prisoner to state "(1) a specific constitutional right, (2) the defendant's intent to retaliate against the prisoner for his or her exercise of that right, (3) a retaliatory adverse act, and (4) causation." *Bibbs v. Early*, 541 F.3d 267, 270 (5th Cir. 2008). An inmate "must allege more than his personal belief that he is the victim of retaliation; that is, mere conclusory allegations of retaliation are not sufficient to state a claim for retaliation." *Lerma v. Fed. Bureau of Prisons*, No. 1:01-cv-232-C, 2003 WL 22121092, at \*7 (N.D. Tex. Sept. 12, 2003). Further, the "inmate must either produce direct evidence of motivation or allege a chronology of events from which retaliation may plausibly be inferred." *Allen v. Thomas*, 388 F.3d 147, 149 (5th Cir. 2004) (internal quotations omitted); *Ward v. Fisher*, 616 F. App'x 680, 684 (5th Cir. 2015)....
>
> The Fifth Circuit requires inmates to allege more than just *de minimis* retaliatory adverse acts to proceed with a retaliation claim. *Morris v. Powell*, 449 F.3d 682, 684-85 (5th Cir. 2006). A claim reaches beyond the *de minimis* threshold if the retaliatory adverse act "is capable of deterring a person of ordinary firmness from further exercising his constitutional rights." *Id.* at 686. However, a claim may remain *de minimis* even if it has retaliatory motive. *See id.* The *de minimis* "threshold is intended to weed out only inconsequential actions and is not a means to excuse more serious retaliatory actions by prison officials." *Id.*

*Pinson v. Santana*, No. 3:13-cv-2098-D, 2015 WL 10550962, at \*5 (N.D. Tex. Nov. 23,

2015) (citation modified), *rec. adopted*, 2016 WL 1161991 (N.D. Tex. Mar. 23, 2016); *see*

*also Brunson v. Nichols*, 875 F.3d 275, 277-78 (5th Cir. 2017) (holding that the "adverse

consequences of Brunson's filing a grievance, including those three weeks Brunson

spent in the SHU after his submission of a grievance but before his disciplinary

hearing, would likely deter a person of ordinary firmness from exercising his

constitutional rights" (citing *Morris*, 449 F.3d at 685-86)).

Guilliot has not alleged a plausible claim of First Amendment retaliation against Defendants Schanfish and McDermott.

First, Defendants raise the prospect that *Bivens* may not apply to this claim. *See, e..g,* Dkt. No. 15 at 7-8. Indeed, the Fifth Circuit recently observed that

> [i]t appears that we have never framed as a holding a rule that *Bivens* extends to First Amendment retaliation cases, but we have at times assumed that substantive claims under [42 U.S.C.] § 1983 and *Bivens* are coextensive. We have on more than one occasion assumed that *Bivens* supplies a remedy in similar cases. But in *[Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017),]* the Supreme Court strongly cautioned against extending *Bivens* to new contexts. *Id.* at 1857. A First Amendment claim is likely a new context. *See id.* at 1860; *Wood v. Moss*, 134 S. Ct. 2056, 2067 ("[W]e have several times assumed without deciding that *Bivens* extends to First Amendment claims."); *Iqbal*, 556 U.S. at 675 ("Indeed, we have declined to extend *Bivens* to a claim sounding in the First Amendment.").

*Brunson*, 875 F.3d at 279 n.3 (citations omitted and modified).

But assuming that *Bivens* may apply to First Amendment retaliation – since, in *Brunson*, the Fifth Circuit invited the district court, on remand, to appoint counsel for the *pro se* plaintiff "to brief this important issue," *id.* – the search of Guilliot's cell – the alleged retaliatory act in Guilliot's chronology of events most temporally connected to his request for the Rider-Waite Tarot deck – does not cross the *de minimis* threshold, s*ee, e.g., Ephraim v. Miller*, No. 2:06-cv-51, 2006 WL 2583362, at *2 (N.D. Tex. Sept. 5, 2006) ("The one-time cell search for missing property does not appear to have been anything more than an inconvenience for plaintiff and was clearly a *de minimis* act."). That the search of a prisoner's cell does not itself cross the *de minimis* threshold makes sense considering that, "[t]o determine whether or not alleged retaliatory acts are *de*

-16-

*minimis*, the court must tailor its inquiry to the specific context in which the alleged acts took place, in this case a [federal] prison." *Salahuddin v. Mead*, No. 95 Civ 8581 (MDM), 2002 WL 1968329, at *4 (S.D.N.Y. Aug. 26, 2002) (citations omitted); *see id.* at *5 ("In this case, ... plaintiff has alleged no special deprivation that would deter a prisoner, whose cell can be searched at any time, *see Hudson v. Palmer*, 468 U.S. 517, 527-28 (1984), and whose interactions with the outside world are subject to extensive regulation by prison authorities, *see Thornburgh v. Abbott*, 490 U.S. 401, 407-08 (1989), from continuing to file grievances against prison officials."); *see also Pope v. Bernard*, No. 10-1443, 2011 WL 478055, at *2 (1st Cir. Feb. 10, 2011) (per curiam) ("Here, appellant never even had a disciplinary charge filed against him regarding possession of the Kufi, and he had no privacy expectations in his cell under *Hudson*. Given this, any claim based on the search of appellant's cell and the seizure of his Kufi can only be described as *de minimis*." (citing *Morris*, 449 F.3d at 684)); *cf. Driggers v. Cruz*, 740 F.3d 333, 336 n.2 (5th Cir. 2014) (noting that "prison officials['] enforcing a generally applicable prison regulation" without more cannot meet the "intent to retaliate" prong).

Even if his being placed on a CMP can be considered more than *de minimis*, Guilliot alleges that this action resulted from his possession of the confiscated material seized from this cell. *See* Dkt. No. 3 at 5 ¶ 19 ("On March 2nd, 2017, McDermott met with Plaintiff and imposed a [CMP] based on Plaintiff's possession of materials falsely categorized by McDermott as containing nudity, explicit sexual acts, and adolescents."). This allegation combined with *Hudson*'s holding that a prisoner has no expectation of privacy in his cell shows that retaliation may not be plausibly inferred from the

chronology of events connecting Guilliot's request for the Rider-Waite Tarot deck to his ultimately being placed on a CMP. And his claim of First Amendment retaliation should be dismissed.

### D.    Due Process [Claim 5]

Construing Claim 5 as a *Bivens* claim against Defendant McDermott, Guilliot alleges that "[t]he nebulous definition of 'risk-relevant behavior'" contained in a BOP program statement applicable to sex offenders that he was found to have violated "is so vague as to fail to provide notice to inmates that their otherwise legal behavior is prohibited." Dkt. No. 3 at 9 ¶ 40.

As a regulation, a BOP program statement

> "is void for vagueness if it (1) 'fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits,' or (2) 'authorizes or even encourages arbitrary and discriminatory enforcement.'" *Ryan v. Seism*, 474 F. App'x 49, 52 (3d Cir. 2012) (quoting *Hill v. Colorado*, 530 U.S. 703, 732 (2000)). Although "[d]ue process undoubtedly requires certain minimal standards of specificity in prison regulations," given the fundamental difference between prison society and the free society, the degree of specificity required of prison regulations is not as strict as that required of ordinary criminal sanctions. *Meyers v. Alldredge*, 492 F.2d 296, 310 (3d Cir. 1974). "'Prisoners, unlike free men, must well know that they are considered potentially dangerous men and must expect to be highly regimented. In such cases the law requires less in the way of notice, and places a greater burden on the individual to make inquiry or ask permission before acting.'" *Id.* at 311 (quoting *Landman v. Royster*, 333 F. Supp. 621, 655-56 (E.D. Va. 1971)).

*Parks v. O'Shaughnessy*, No. 1:14-CV-01268, 2016 WL 4385869, at *5 (M.D. Pa. May 3, 2016) (citation modified), *rec. adopted*, 2016 WL 4271766 (M.D. Pa. Aug. 15, 2016); *see also Adams v. Gunnell*, 729 F.2d 362, 369 (5th Cir. 1984) ("Because 'legalistic

-18-

wrangling' over the meaning of prison rules 'may visibly undermine the [prison] administration's position of total authority,' federal courts have deferred to the interpretation of those rules by prison authorities 'unless fair notice was clearly lacking.'" (quoting *Hadden v. Howard*, 713 F.2d 1003, 1008 (3d Cir. 1983) (quoting, in turn, *Meyers*, 492 F.2d at 311))); *Jones v. Jones*, No. 1:17-CV-70, 2018 WL 1525439, at *2 (E.D. Tex. Mar. 27, 2018) ("Petitioner's argument that the definition of Prohibited Act Code 203 is unconstitutionally vague similarly lacks merit. 'It is a basic principle of due process that a law is void for vagueness if its prohibitions are not clearly defined.'" (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972))).

"To establish a due process violation," moreover, "a prisoner must show that he was deprived of a liberty interest protected by the Constitution or other law," *Jacques v. Bureau of Prisons*, 632 F. App'x 225, 225 (5th Cir. 2016) (citing *Sandin v. Conner*, 515 U.S. 472, 483-84 (1995)) – such as "a liberty interest in good-time credits," *Pruitt v. Martin*, 582 F. App'x 319, 320 (5th Cir. 2014) (per curiam) ("When a prisoner has a liberty interest in good-time credits, revocation of such credits must comply with minimal procedural requirements." (quoting *Henson v. U.S. Bureau of Prisons*, 213 F.3d 897, 898 (5th Cir. 2000) (citing, in turn, *Superintendent, Mass. Corr. Institution v. Hill*, 472 U.S. 445, 454 (1985)); internal quotation marks omitted)). But "[n]ot every punishment for prison misconduct implicates a protected liberty interest." *Jacques*, 632 F. App'x at 225 (citing *Sandin*, 515 U.S. at 485-87).

> In the case of a prisoner, a "liberty interest" is freedom from restraint which "'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" *Wilkinson v. Austin*, 545

U.S. 209, 223 (2005) (quoting *Sandin*, 515 U.S. at 484).... [And, i]n the case of classifications of inmates, "Congress has given federal prison officials full discretion to control these conditions of confinement." *Moody v. Daggett*, 429 U.S. 78, 88 n.9 (1976). Thus, it has been held repeatedly that prisoners have no constitutional right to any specific classification. Consequently, "[a]n inmate does not ... have a liberty interest in avoiding a particular condition of confinement, including a particular security classification or placement in a particular facility, unless the condition imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."

*Isler v. Grondolsky*, 942 F. Supp. 2d 170, 175 (D. Mass. 2013) (citations omitted and modified).

The BOP program statement that Guilliot challenges on due process grounds is applicable to him because of his classification as a sex offender, but Guilliot cannot allege that "his internal classification as a sex offender has imposed an 'atypical and significant hardship' rising to the level of a constitutional violation, and courts have consistently rejected constitutional challenges to such classifications made in accordance with BOP regulations." *Id.* at 175-76 (collecting cases). Thus, particularly considering that he has not alleged that being placed on a CMP resulted in a loss of good-time credits, Guilliot has not alleged that he has been deprived of a liberty interest. Claim 5 construed as a *Bivens* claim against Defendant McDermott should therefore be dismissed for failure to state a claim.

III.   Qualified Immunity

Defendants contend at several points in their Rule 12(b)(6) briefing that they are entitled to qualified immunity on certain claims. But, as to that affirmative defense, the undersigned's general practice (for consent cases and cases referred for case

management) requires that defendants file a motion for summary judgment that asserts that defense – or file a motion for summary judgment after asserting that defense in a responsive pleading. And, before taking that motion under submission, the undersigned also requires that a plaintiff be given an opportunity to move for leave to conduct limited discovery that is narrowly tailored to uncover facts that the Court needs to rule on that defense. The requests for qualified immunity should therefore be denied without prejudice to being reasserted in a motion for summary judgment.

## Recommendation

The Court should dismiss Claim 3, Claim 4, and – as asserted against Defendants D.J. Harmon, Dr. Jennifer Caperton, and Dr. Kevin McDermott in their official capacities – Claim 5 for lack of subject matter jurisdiction; dismiss Claim 2 and – as asserted against Defendant McDermott in his individual capacity – Claim 5 for failure to state a claim; but otherwise deny Defendants' motion to dismiss [Dkt. No. 14] and allow Plaintiff Saul V. Guilliot leave to file an amended complaint within a reasonable amount of time to be set by the Court.

A copy of these findings, conclusions, and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions, and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions, and recommendation

where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

    DATED: July 25, 2018

_____

DAVID L. HORAN
UNITED STATES MAGISTRATE JUDGE